**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KIA GAYMON et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No. 14-5454** |
| **v.** | : | |
| | : | |
| **BOROUGH OF COLLINGDALE et al.,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                                                    **JULY 17, 2015**

### MEMORANDUM OPINION

This is a case where, if the allegations are true, a petty complaint from a neighbor led to a grossly disproportionate response by police, culminating in officers entering a family's home and arresting its owner for doing nothing more than attempting to videotape the officers' over-reaction on her own property. It is a claim which can only be described as having particular resonance when viewed against the backdrop of recent events nationally, where videotapes by citizens have proven to be indispensable in bringing to light instances where police unfortunately misused their power. The facts remain unproven, but Defendants here seek to prevent Plaintiffs from even making their case by claiming that they are entitled to qualified immunity. When viewed against the allegations of this Complaint, the assertion of that defense, which would terminate this case at its outset, brings into sharp focus the question of whether the doctrine of qualified immunity is being invoked more than is warranted. Suffice it to say that dismissing this Complaint at the pleading stage given the record before me would risk rendering the Bill of Rights meaningless, at least as it applies to the sanctity of a citizen's home. Accordingly, the Motion to Dismiss has been denied.

### I.    Facts Alleged in Plaintiffs' Complaint

Plaintiff Kia Gaymon is a 38-year-old social work supervisor for a nonprofit agency.  She has a Masters of Social Work from Temple University.  Her husband, Plaintiff Michael Gaymon, is a 35-year-old technician with a telecommunications utility company, in addition to currently completing his college education.  They have a 21-year-old daughter, Plaintiff Sanshuray Purnell, and a 10-year-old son.  They own a home in Collingdale, Pennsylvania, where they have lived with their children since March 2007.

On February 22, 2014, Defendant Officers Carl White and William Eckert went to Plaintiffs' home in response to a call made by their next-door neighbor, who allegedly complained that Mr. Gaymon's mother (a guest in their home at the time) had parked her car so that the front tire was on the curb in front of the neighbor's house.  Upon arriving, the Defendant officers confronted Plaintiffs as they were leaving for a family outing.  According to the Complaint, Defendant White began yelling at them in an aggressive manner, asking who spit at their neighbor.

Plaintiffs Mrs. and Mr. Gaymon explained that they had done nothing wrong, and that their neighbor falsely accused them of spitting at her.  Defendant White then allegedly approached Mr. Gaymon in an antagonistic way, placing his face within inches of Mr. Gaymon's face while yelling at him.  Mrs. Gaymon, concerned about the officer's aggressive conduct, took out her cell phone and began making a video recording.  Officer White approached Mrs. Gaymon, at which point she moved inside her home, continuing to video White by either leaning around the storm door or through the window in the door.

According to the Complaint, White ordered Mrs. Gaymon to stop videotaping him, and declared that her doing so violated Pennsylvania's wiretap statute.  Her husband and daughter,

who were standing in front of their home, told White he was incorrect, and Mrs. Gaymon had a right to record.  White told Mrs. Gaymon that if she did not stop taping him, he would enter her house, seize her phone, and arrest her.  Mrs. Gaymon told White he was not permitted to enter her home.  He walked up the stairs to the front entrance, but before entering, he grabbed her daughter Sanshuray, handcuffed her, placed her under arrest, and threatened to deploy his Taser against her.  Officer Eckert then removed Sanshuray from the scene.

Officer White is next alleged to have entered Plaintiffs' home and ordered Mrs. Gaymon again to stop videotaping him.  Mrs. and Mr. Gaymon reiterated that they did not consent to his entry, and he was not permitted to be in their home.  Ignoring them, Defendant White allegedly grabbed Mrs. Gaymon, pushed her up against the wall, and held his Taser to her chest.  At this time, Defendant Officers Eckert and others identified as "John Does" joined Officer White and placed Mrs. Gaymon under arrest.  They removed Mrs. Gaymon from her home, placed her in a separate police vehicle from her daughter, and drove both women to the Collingdale Police Station.

The officers released Mrs. Gaymon and Sanshuray from police custody later that day, stating they would receive citations in the mail for "disorderly conduct" under 18 Pa. Cons. Stat. § 5503, which they did.  As a result, they retained counsel to represent them during their court proceeding.  On May 22, 2014, Mrs. Gaymon and Sanshuray appeared before a Magisterial District Justice.  After hearing testimony from Defendant White, the Magisterial District Justice dismissed all charges.

Plaintiffs contend that they never engaged in wrongdoing of any kind, and Defendants never had probable cause to believe they engaged in disorderly conduct or committed any other criminal violation.  They further plead that the criminal proceedings were maliciously initiated.

In addition, Plaintiffs claim that Defendants did not have legal cause to enter their home, and the Defendant officers' acted in retaliation for Plaintiffs' engaging in First Amendment activity, including disagreeing with Defendant White and protesting the officers' entry into their home.

The Complaint consists of four civil rights claims brought under 42 U.S.C. § 1983 against the Borough of Collingdale and the individual Defendants:  Officers White, Eckert, and Does.  Mrs. Gaymon and Sanshuray Purnell assert a Fourth Amendment wrongful arrest claim (Count I); a Fourth Amendment malicious prosecution claim (Count II); and a First Amendment retaliatory arrest claim (Count III).  Joined by Mr. Gaymon, they further assert a Fourth Amendment unlawful search violation (Count IV).

## II.    Discussion

Defendants moved to dismiss Plaintiffs' Complaint, arguing that the Defendant officers are entitled to qualified immunity.  In their written motion, Defendants argued that whether Mrs. Gaymon's conduct in recording Officer White violated the Pennsylvania Wiretap Act was not clearly established as of February 22, 2014, which would have resulted in dismissal of only Mrs. Gaymon's unlawful arrest and malicious prosecution claims.[1]

At oral argument, defense counsel took the bold position that qualified immunity should be extended to shield the Defendant officers from **all** liability, including the constitutional claims alleged by Ms. Purnell and Mr. Gaymon.  Defendants sought to redefine the focus of the qualified immunity analysis to whether there was a clearly established "First Amendment right to

---

[1] That is, even if the law concerning the Pennsylvania Wiretap Act was not clearly established in 2014, mistakenly finding probable cause for a violation of the Act would not have given the Defendant officers a license to enter the Gaymon's home without legal cause or consent, or to arrest Ms. Purnell for disagreeing with Defendant White's actions.  See, e.g., Steagald v. United States, 451 U.S. 204, 211 (1981) ("The search at issue here took place in the absence of consent or exigent circumstances.  Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."); Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 910 (3d Cir. 1984) ("The Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech.  Norwell v. City of Cincinnati, 414 U.S. 14, 16, 94 S.Ct. 187–188, 38 L.Ed.2d 170 (1973).").

record" police officers performing their official duties at the time of the alleged incident in 2014. I will analyze these distinct arguments separately, but the result remains the same regardless of how one frames the issue.  Under these circumstances, qualified immunity provides no defense.

### a.  Legal Standard

In determining whether the Defendant officers are shielded from liability based on qualified immunity, I must accept Plaintiffs' factual allegations as true and draw all reasonable inferences in their favor.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); George v. Rehiel, 738 F.3d 562, 571 (3d Cir. 2013).  "Qualified immunity shields government officials from personal liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  George, 738 F.3d at 571–72 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The doctrine is intended to give officers "breathing room to make reasonable but mistaken judgments about open legal questions."  Id.  Consequently, "[a]ny claim of qualified immunity must be resolved at the earliest possible stage of the litigation."  Miller v. Clinton County, 544 F.3d 542, 547 (3d Cir. 2008).  Defendants emphasize that under a proper qualified immunity analysis, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law."  Id. at 572 (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011)).

To overcome the defense of qualified immunity, Plaintiffs must allege facts showing that the Defendant officers' conduct (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  George, 738 F.3d at 572 (quoting al-Kidd, 131 S. Ct. at 2080).  Following Pearson v. Callahan, 555 U.S. 223, 236 (2009), I do not need to undertake the two-part inquiry in sequential order.  Here, given the conduct of the police—following Mrs. Gaymon into her home over her protest and charging her for

5

videotaping on her own property—I will focus on the second part of the test concerning whether the law was clearly established.

Defendants bear the burden of establishing their entitlement to the affirmative defense of qualified immunity.  See Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014).  Thus, in light of Defendants' arguments, to succeed under either theory, they must prove that the statutory or constitutional right in question was not clearly established at the time of the incident.  For purposes of this inquiry, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Schneyder v. Smith, 653 F.3d 313, 329 (3d Cir. 2011) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  In evaluating the state of the law in 2014, the "salient question" is whether the officers had "fair warning" that their conduct was unconstitutional.  See Hope v. Pelzer, 536 U.S. 730, 741 (2002).

> Of particular significance here:
>
> [t]o be established clearly, however, there is no need that "the very action in question [have] previously been held unlawful."  Wilson v. Layne, 526 U.S. 603, 615 (1999).  The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "**[t]he easiest cases don't even arise**."  K.H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990).  But even as to action less than an outrage, "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances."  Hope v. Pelzer, [536 U.S. at 741].

Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 377–78 (2009) (emphasis added).  When no case law addresses the specific facts at issue, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."[2]  Hope, 536 U.S. at 741.  See also Schneyder, 653 F.3d at 330 ("There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not

---

[2] "In other words, certain conduct will be so extreme that one would not expect a prior decision on the issue: In some cases this absence of precedent may even evince the impropriety of the practice."  Alexander A. Reinert, "Does Qualified Immunity Matter?" 8 U. St. Thomas. L. J. 477, 484 (Spring 2011).

follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.") (internal citation omitted); Sterling v. Borough of Minersville, 232 F.3d 190, 198 (3d Cir. 2000) ("Because the confidential and private nature of the information was obvious, and because the right to privacy is well-settled, the concomitant constitutional violation was apparent notwithstanding the fact that the very action in question had not previously been held to be unlawful.").

### b.  The Charge of Disorderly Conduct

Upon review of the record here, I find it appropriate to echo the Third Circuit in Schneyder, because this case strikes me as "a member of that class of 'easiest cases' that, according to Judge Posner, 'don't even arise.' " 653 F.3d at 330.  Perhaps the self-evident wrongfulness of the officers' conduct here is best illustrated by the clear terms of the disorderly conduct statute under which Mrs. Gaymon and her daughter were charged:

> A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> (1) engages in fighting or threatening, or in violent or tumultuous behavior;
>
> (2) makes unreasonable noise;
>
> (3) uses obscene language, or makes an obscene gesture; or
>
> (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa. Cons. Stat. § 5503(a).

Section (c) of the statute specifically defines "public" as "affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public."  Plaintiffs plead that they were on their own property, preparing to leave their home on a family outing

7

when the Defendant officers *approached them* in an accusatory and aggressive manner, and that the officers followed Mrs. Gaymon inside.

The threshold question for each of Plaintiffs' Fourth Amendment claims is whether the Defendant officers had probable cause to believe Mrs. Gaymon and Ms. Purnell violated the disorderly conduct statute. Henry v. United States, 361 U.S. 98, 102 (1959) ("while a search without a warrant is, without limits, permissible if incident to a lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause."); Johnson v. Knorr, 477 F.3d 75, 81–82 (3d Cir. 2007) ("To prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that . . . the defendant initiated the proceeding without probable cause."); James v. City of Wilkes–Barre, 700 F.3d 675, 680 (3d Cir. 2012) ("To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause."). Probable cause to arrest is established when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995).

In evaluating the basis for the charge in this case, it is hard to fathom how individuals could intend to cause public inconvenience or alarm based on actions that occurred exclusively on their own property and from within their home. I find it equally hard to understand how merely videotaping an officer's conduct, and thereafter retreating away from an officer to the confines of one's own home, could be in any way causing *public* inconvenience, annoyance, or alarm. Even harder to comprehend is how Ms. Purnell's conduct in informing Officer White about her belief that Mrs. Gaymon had a right to record could amount to disorderly conduct. The

Supreme Court has directly considered factual circumstances where a petitioner was arrested for disorderly conduct after "verbally and negatively" protesting a police officer's treatment of him, and concluded that "[s]urely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." Norwell v. City of Cincinnati, 414 U.S. 14, 16 (1973); Colten v. Kentucky, 407 U.S. 104, 111 (1972) ("Individuals may not be convicted under the [disorderly conduct] statute merely for expressing unpopular or annoying ideas.").[3]

In viewing all facts in the light most favorable to Plaintiffs, as I must, the only aspect of the facts alleged in the Complaint that could alarm the public would be the actions of the police officers in question.  Officer White allegedly threatened to deploy a Taser against two unarmed women, and ultimately forced his way into the Gaymon's home and pinned Mrs. Gaymon against a wall with a Taser to her chest—all in the course of responding to a nuisance complaint during daylight hours.  Even defense counsel could barely muster an argument as to Mrs. Gaymon's disorderly conduct charge:

> The Court: The arrest took place inside Ms. Gaymon's house, correct?
>
> [Counsel]: According to the complaint, that's the way we understand it, yes. . . .
>
> The Court:  And at that point when Ms. Gaymon would be inside, would you agree with me there was no threat to the officer outside, correct?
>
> [Counsel]: I would agree with that circumstance.
>
> The Court: And you would agree with me that standing inside on one's porch simply videotaping, that could not be considered disorderly conduct by any reasonable definition, could it, sir?

---

[3] The breadth of Pennsylvania's disorderly conduct statute gives police broad latitude, which creates the potential for improper charges should that power be abused.  See generally Thomas Place, Offensive Speech and the Pennsylvania Disorderly Conduct Statute, 12 TEMPLE POLITICAL AND CIVIL RIGHTS L. REV. 47 (2002) (discussing limits constructions that Pennsylvania courts have imposed on the state's disorderly conduct statute, and arguing that parts of the statute are still unconstitutionally overbroad or vague).

[Counsel]: If you're standing inside your home and videotaping outside, no, I don't think so.

Transcript of Oral Argument, April 10, 2015, at 9.

Based on the foregoing, any reasonable officer should have known that pursuing disorderly conduct charges against Mrs. Gaymon and Ms. Purnell constituted a blatant violation of their Fourth Amendment rights. There are simply no facts before the Court at this early stage that would sustain a reasonable belief that the disorderly conduct statute was violated by either woman. Perhaps even more apparent, no reasonable officer could claim that arresting Mrs. Gaymon and Ms. Purnell because they voiced disagreement with the officers' conduct constituted lawful police action. The law within the Third Circuit was clear dating back to 1984 that "institution of criminal action to penalize the exercise of one's First Amendment rights is a deprivation cognizable under §1983." Losch v. Borough of Parkesburg, Pennsylvania, 736 F.2d 903, 907–08 (3d Cir. 1984). Therefore, viewing the facts alleged from a broad constitutional perspective, there is no question that the Defendant officers had notice when this incident occurred that the conduct alleged would violate Plaintiffs' First and Fourth Amendment rights.

I next turn to the specific grounds on which Defendants seek to cloak their actions with qualified immunity.

### c. Purported Violation of the Pennsylvania Wiretap Act

In their brief, Defendants argued that Pennsylvania law was not clearly established in 2014 regarding whether the Wiretap Act, 18 Pa. Cons. Stat. §§ 5701–82, gave them authority to act as they did. This argument is patently lacking in merit. Defendants' initial argument relied almost exclusively on the Third Circuit's unpublished decision in Kelly v. Borough of Carlisle, 544 F. App'x 129 (3d Cir. 2013) ("Kelly II"), without any discussion of the Third Circuit's earlier *precedential* and controlling opinion in Kelly v. Borough of Carlisle, 622 F.3d 248 (3d

Cir. 2010) ("Kelly I").  There, the Circuit held that absent a "reasonable expectation of privacy," an officer cannot claim a violation of the Wiretap Act.  The Court of Appeals noted that even **secret** recordings would not be a violation:  "Even more to the point, two Pennsylvania Supreme Court cases—one almost 20 years old at the time of Kelly's arrest—had held that covertly recording police officers was not a violation of the Act."  Kelly I, 622 F.3d at 258.

Qualified immunity was found in Kelly II because the officer sought out and in good faith relied upon advice received from a prosecuting attorney during a traffic stop—an entirely distinct set of circumstances.  544 F. App'x at 137.   In fact, in Kelly II, the Court specifically rejected the position Defendants advance here: "We have already determined that, 'at the time of Kelly's arrest, it was clearly established that a reasonable expectation of privacy was a prerequisite for a Wiretap Act violation.' "  544 F. App'x at 134 (citing Kelly I, 622 F.3d at 258).

Given the clear state of controlling federal and state law in 2014, Defendants are left to argue that officers should be entitled to deference for the split-second decisions they must make in the field under a variety of uncertain and rapidly evolving circumstances, and that no officer can be a "constitutional scholar."  Defendants' Brief at 10.

In no respect does the controlling law in this case impose a burden on an officer to be a legal expert.  By its very nature, the term "wiretapping" connotes covert action.[4]  The following exchange at argument drives home the point:

> THE COURT:  Isn't the Pennsylvania Wiretap Act clearly aimed at covert or surreptitious interception of communication rather than open and obvious recording communication?
>
> COUNSEL:  I think that's true.

---

[4] Of note, two leading and commonly used dictionaries, Merriam-Webster and Oxford, define wiretapping as action taken "secretly."

Transcript of Oral Argument, April 10, 2015, at 7.  Indeed, based upon the Court's review, there

is no reported case of a conviction under the Act for open reporting.

Here, Mrs. Gaymon openly videotaped the officers, and the recording took place within

the curtilage of her property and inside her home.  No officer could credibly claim any

expectation of privacy on Plaintiffs' property or inside their house.  If anyone had an expectation

of privacy under these circumstances, it was clearly the Gaymons.  Unlike Kelly II, there are no

allegations that Defendant White stopped and in good faith sought advice provided from a

prosecuting authority.  Moreover, in Kelly there was at least some basis on which a uniformed

officer might be confused, because the recording there was "surreptitious," as opposed to Mrs.

Gaymon's open and obvious recording.  Without a doubt, Mrs. Gaymon **wanted** the officer to

know he was being recorded.  This was not an "inherently dangerous situation," such as a traffic

stop.  Kelly I, 622 F.3d at 262 (citing Arizona v. Johnson, 555 U.S. 323 (2009)).  Rather, the

officers responded during daylight to a non-violent complaint about a vehicle's tire touching the

curb in a residential neighborhood.[5]  See Crawford v. Geiger, 996 F. Supp. 2d 603, 615–16 (N.D.

Ohio 2014) (distinguishing Kelly based on similar factual allegations and concluding that a

rational juror could find that the videotaping of police officers occurred only after the officers

"were acting without lawful authority.").

Finally, it is telling that Mrs. Gaymon was never charged with a violation of the Wiretap

Act.  If the Defendant officers mistakenly believed that Mrs. Gaymon's conduct violated the

---

[5] The Court raised the seemingly benign context of the original complaint to police during argument, to which defense counsel clarified, "Yes, I think according to the complaint, it's not exactly spelled out, but there is a neighborhood dispute that apparently goes back and the complaint kind of picks up at the point where the officer is responding to [the neighbor's report of a tire on the curb]."  Transcript of Oral Argument, April 10, 2015, at 11.  I recognize that there is likely another side to the story, but at this early juncture, my review is limited.  Plaintiffs allege that the officers responded to a complaint that Mr. Gaymon's mother "parked her car in such a way that the front tire was on the curb in front of the neighbor's house."  Complaint at ¶ 18.

Wiretap Act, it is reasonable to infer that they would have charged Mrs. Gaymon with that offense, and of course they did not.

### d. The Relevance of a "Right to Videotape"

Perhaps recognizing the lack of legal support for their Wiretap Act stance, Defendants' position shifted at oral argument, attempting to redefine the issue as whether Mrs. Gaymon had a First Amendment right to video her family's interaction with the officers in question.

> [Counsel]: I think the basic issue that we're going to be coming back to again in this case is whether there is a clearly established constitutional right to videotape law enforcement officers as they are performing their duties.
>
> THE COURT: But, isn't that a separate question from whether the officer here had any good faith basis to take people into custody under the wiretap law? Isn't the First Amendment issue separate from the actions of the defendants?
>
> [Counsel]: I think they are really bound together, Your Honor. I don't see how you can get to one without getting to the other. I think this officer, rightly or wrongly, believed that the law did say, or at least the law was not established enough, that they did not have -- anybody did not have a clearly established constitutional right to videotape it, and I think that's where we start with in this case, so I think everything at this stage is going to flow back to that.

Transcript of Oral Argument, April 10, 2015, at 5–7.

For practical purposes, the defense seeks to find refuge in <u>Montgomery v. Killingsworth</u>, No. 13-256, 2015 WL 289934 (E.D. Pa. Jan. 22, 2015), a recent decision by my colleague Judge Yohn. That case arose in a far different context, because it involved recordings made by citizens who were not themselves the focus of police activity, and who inserted themselves into ongoing police action while officers were discharging their duties in public.

Turning to <u>Killingsworth</u> itself, it involved plaintiffs who were arrested in 2011 for three unrelated interactions with Philadelphia police officers. <u>Id.</u> at *1. Two plaintiffs pleaded First Amendment retaliation claims, arguing that the act of recording police activity was protected conduct. <u>Id.</u> The third plaintiff claimed retaliation for peacefully objecting to a police officer's

treatment of an intoxicated man on her street.  Id.  Judge Yohn held that a right to record officers

in public was not clearly established as of 2011.  Id. at *15.  Accordingly, for those plaintiffs

alleging retaliation based solely on the purported First Amendment right to record, the defendant

officers were entitled to qualified immunity.[6]  Id.

In contrast, qualified immunity was rejected for the remaining First Amendment claim

because "peaceful criticism of a police officer that neither obstructs an investigation nor

jeopardizes a police officer's safety has strong social value, serving as a valuable check on state

power, and is therefore protected under the First Amendment."  Killingsworth, 2015 WL

289934, at *8 (citing Gentile v. State Bar of Nev., 501 U.S. 1030, 1034 (1991) ("There is no

question that speech critical of the exercise of the State's power lies at the very center of the First

Amendment.").[7]

Here, Defendants' attempt to redefine **all** of Plaintiffs' claims as subsumed within an

ambiguous question of law is a misuse of the doctrine of qualified immunity.[8]  Plaintiffs together

bring three claims under the Fourth Amendment and one claim under the First Amendment.  The

First Amendment claim asserts retaliation for the protected activity of voicing dissent in the face

of questionable police action.  Plaintiffs' Complaint alleges three specific instances of protective

---

[6] See George, 738 F.3d at 585 ( "In order to establish a First Amendment retaliation claim, a plaintiff must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation.  The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation.") (internal citations and quotations omitted).

[7] I also note that although plaintiffs' allegations included Fourth Amendment malicious prosecution, false arrest, false imprisonment, and illegal search and seizure claims, as well as a Fourteenth Amendment excessive force claim, the defendant officers in Killingsworth notably, and in this Court's view, wisely, limited their summary judgment motion to the First Amendment retaliation claims.

[8] Critics of the expanding scope of qualified immunity have cautioned that courts applying the law risk blurring the line between absolute and qualified immunity.  See, e.g., Susan Bendlin, "Qualified Immunity: Protecting 'All but the Plainly Incompetent' (And Maybe Some of them, Too)," 45 J. MARSHALL L. REV. 1023, 1046 (Summer 2012).  Of course, "it is appropriate to shield government workers from individual liability if they perform their jobs reasonably and competently.  The risk, however, is that the test is applied so broadly that it may also protect those state officials who unreasonably and incompetently violate the individual rights of a citizen."  Id. at 1049.

speech, only one of which is videotaping.  <u>See</u> ¶ 52.  Having failed to establish a basis for

charging disorderly conduct, and having badly misconstrued Pennsylvania's Wiretap Law,

Defendants cannot globally excuse their conduct by professing confusion about a legal principle

that at most would impact one of three allegations forming the basis for Plaintiffs' sole First

Amendment claim.

<u>Killingsworth</u> involved events in 2011.  Even if I assume that there was still no clearly

established First Amendment right to record officers by 2014, the lack of such a right would not

transform a citizen's act of recording on her own property to something criminal in nature

justifying arrest.  It is certainly clear that the absence of a First Amendment right to record from

the confines of one's own home would not amount to exigent or other circumstances that would

justify entering the Plaintiffs' home without a valid warrant or consent.  <u>See, e.g.</u>, <u>Steagald</u>, 451

U.S. at 211.  The <u>Killingsworth</u> plaintiffs were all citizens who came upon police activity on

public streets and undertook the role of observers and recorders of events.  The issues presented

by cases of that nature, where the person inserts himself into a situation as the police are

discharging their duties, bear little relevance to this case, where Mrs. Gaymon was either on or

inside her private property at all times, the police had entered onto that property without

permission, and in addition to herself, both her daughter and husband were directly affected by

the actions of the police.

Finally, Plaintiffs' retaliatory arrest claim focuses on the Plaintiffs' First Amendment

right to "verbally express their disagreement with and challenge the authority" of the Defendant

officers.  Complaint at Count III.  "The Supreme Court has explicitly held that an individual has

a viable claim against the government when he is able to prove that the government took action

against him in retaliation for his exercise of First Amendment rights." <u>Anderson v. Davila</u>, 125

F.3d 148, 160 (3d Cir. 1997).  It is indisputable that "the First Amendment protects a significant

amount of verbal criticism and challenge directed at police officers."  <u>City of Houston, Texas v.</u>

<u>Hill</u>, 482 U.S. 451, 461 (1987).  In fact, the Supreme Court has gone so far as to say that "[t]he

freedom of individuals verbally to oppose or challenge police action without thereby risking

arrest is one of the principal characteristics by which we distinguish a free nation from a police

state."  <u>City of Houston, Tex.</u>, 482 U.S. at 462–63.  "[At] least where the First Amendment is

concerned, the motives of government officials are indeed relevant, if not dispositive, when an

individual's exercise of speech precedes government action affecting that individual."  <u>Anderson</u>,

125 F.3d at 161.  Here, a jury could reasonably conclude that the Defendant officers arrested

Mrs. Gaymon and Ms. Purnell for voicing disagreement about the officers' actions in violation of

the First Amendment.  Accordingly, a jury could find liability on every constitutional claim

alleged without ever needing to confront the issue of whether recording an officer under these

circumstances is protected by the First Amendment.[9]

---

[9] Although I do not need to reach the question of whether Mrs. Gaymon's conduct in recording Officer White was protected under the First Amendment, I note that federal case law has overwhelmingly held that citizens do indeed have a right to record officers in their official capacity so long as they do not interfere with an officer's ability to do his or her job. <u>E.g.</u>, Elizabeth J. Frawley, "No Calling Cut: The Political Right to Record Police," 17 U. PA. J. CONST. L. 287, 288 (October 2014).

> Over the past decade, four circuits have decided cases in which a civilian recorded was arrested or forced to cease recording.  The recorders, believing this to be a violation of their First Amendment rights, filed claims pursuant to 42 U.S.C. § 1983.  The decisions collectively indicate that there is a firmly established First Amendment right to record police officers, but that courts are only starting to address the Fourth Amendment concerns.  While the recorder does have a First Amendment right to record, the right overlaps with Fourth Amendment jurisprudence dictating the reactions permissible by law enforcement officers.  In addition, the right to record cannot be so limitless as to allow recorders to directly interfere with law enforcement.

<u>Id.</u> Indeed, within this District, my colleague Judge Bartle found a First Amendment free speech right to videotape police officers as they went about their duties on a public highway in *2002*, where the recording was done from private property and did not interfere with the police officers' activity.  <u>Robinson v. Fetterman</u>, 378 F. Supp. 2d 534, 538–42 (E.D. Pa. 2005).  "Videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case.  In sum, there can be no doubt that the free speech clause of the Constitution protected Robinson as he videotaped the defendants on October 23, 2002."  <u>Id.</u> at 541.

### III.      Conclusion

It is the combination of factors that make this case compelling to the Court on the facts alleged: the frivolous nature of the neighbor's initial complaint; the absence of lurking risks inherent in other police activities, such as traffic stops; the alleged aggressiveness of the responding officers; the purported threat to deploy Tasers against a family on the premises of their own home; the overall disproportionate response of law enforcement; the protective instincts of a wife and mother seeking only to record what was occurring; the makeweight nature of the criminal charges brought; and finally, the contorted nature of the qualified immunity defense raised.

Defendants have the right to contest, and may well disprove, these allegations at trial. But the contention that no reasonable officer would have understood that such conduct would palpably violate our Constitution is utterly lacking in merit.  Therefore, qualified immunity is not a viable defense at this preliminary stage.  Defendants' Motion has been denied.

_____/s/ Gerald Austin McHugh
United States District Court Judge

---

For examples of various policy and legal reasons that recording public officials should receive First Amendment protection, see Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 350–94 (2011):

> [P]olice abuse captured by the cameras of bystanding videographers, followed by public broadcast of the footage, has become a regular feature of our public life and the underpinning of effective demands for redress. . . . [Police] are accustomed . . . to substantial deference in the construction of official narratives, and many would prefer to be in a position to shape perceptions of their actions without competing digital records.  Police officers often view private digital image capture as a challenge to their authority. . . . In the last two generations, emerging technology and social practice have made captured images part of our cultural and political discourse. . . . In the current state of the law and culture of discourse, captured images--like words inscribed on parchment--fall within the protection of "freedom of speech." . . . Participants in public dialogue who are barred from capturing images are at a substantial discursive disadvantage vis-à-vis those who can record from life.  Officials engage in virtually unchecked surveillance of public encounters.  A rule that bars citizens from capturing images gives unbalanced authority to official framing. . . . Allowing statutes that prohibit "interfering with an officer" or "disobeying an officer" to punish inconvenient image capture puts police officers in the constitutionally impermissible position of censoring critical expression with unconstitutional impunity.